Argued and submitted March 6, 2015, affirmed April 5, petition for review
allowed August 3, 2017 (361 Or 800)

COOS WATERKEEPER
*Former Petitioner,*
*and*

SIERRA CLUB,
Greenpeace, and
Friends of Living Oregon Waters,
*Petitioners,*

*v.*

PORT OF COOS BAY OREGON
and Department of State Lands,
*Respondents.*

Office of Administrative Hearings
1202690; A154347

395 P3d 14

Jan Hasselman, Washington, argued the cause for petitioners. With her on the briefs were Janette K. Brimmer, Earthjustice, Karl G. Anuta and Karl G. Anuta, P. C.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent Department of State Lands. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Inge D. Wells, Assistant Attorney General, and Matthew J. Preusch, Assistant Attorney General.

David A. Bledsoe, Steven L. Pfeiffer, Teresa Jacobs, and Perkins Coie LLP filed the brief for respondent Port of Coos Bay Oregon.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and DeHoog, Judge.*

---

* DeHoog, J., *vice* Nakamoto, J. pro tempore.

## HADLOCK, C. J.

In 2007, the Oregon International Port of Coos Bay (the Port) began the process of applying to the Oregon Department of State Lands (DSL) for a permit to dredge part of Coos Bay to create a new multipurpose slip and marine terminal, along with an access channel connecting Coos Bay with that slip. After responding to DSL's requests for additional information, the Port submitted its completed application in December 2010. The next year, DSL issued a permit authorizing the Port to dredge 1.75 million cubic yards of material from Coos Bay. Specifically, the permit authorized the fill/removal activity of "excavating the access channel, placing dredge soil in a small non-tidal wetland," and undertaking mitigation measures. Petitioners' challenge to that permit led to a contested-case hearing and the parties' filings of cross-motions for summary determination.[1] After further administrative proceedings, the director of DSL issued a final order affirming the fill/removal permit.

Petitioners seek judicial review of that 2013 final order, challenging the director's ruling on the cross-motions for summary determination on two grounds. First, petitioners argue that the director erred in concluding that DSL was not required to consider the effects of operating the marine terminal when it evaluated and approved the Port's application for the fill/removal permit. Second, petitioners argue that the director erred in concluding that DSL's authority to regulate fill/removal activities in "waters of the state" did not extend to the upland portions of the proposed construction. For the following reasons, we affirm.

## I. THE STATUTORY AND REGULATORY FRAMEWORK

To provide context for the parties' arguments, we briefly describe the statutory and regulatory framework

---

[1] The entities challenging DSL's permit originally included Coos Waterkeeper, Friends of Living Oregon Waters, Greenpeace, and the Sierra Club. We refer to those entities collectively as "petitioners" throughout this opinion. However, after petitioners initiated this judicial-review proceeding, they moved to dismiss Coos Waterkeeper as a party, and the court granted that motion on October 2, 2013. Thus, references to "petitioners" should be understood to exclude Coos Waterkeeper with respect to events that occurred after that date.

governing DSL's authority to issue fill/removal permits as it existed in December 2010, when DSL received the completed permit application.[2] Generally, "a person may not remove any material from the beds or banks of any waters of this state or fill any waters of this state without a permit issued under authority of the Director of the Department of State Lands." ORS 196.810(1)(a).

The term "waters of this state" is statutorily defined to mean

"all natural waterways, tidal and nontidal bays, intermittent streams, constantly flowing streams, lakes, wetlands, that portion of the Pacific Ocean that is in the boundaries of this state, all other navigable and nonnavigable bodies of water in this state and those portions of the ocean shore, as defined in ORS 390.605, where removal or fill activities are regulated under a state-assumed permit program as provided [by federal law]."

ORS 196.800(14). DSL has adopted a rule that expressly includes estuaries and tidal bays, up to "the elevation of the highest measured tide," within its own definition of "waters of the state." OAR 141-085-0510(89); OAR 141-085-0515(2).[3]

Coos Bay is a tidal bay and therefore is, under those definitions, a water of the state. Accordingly, the Port was required to obtain a permit from DSL before either removing any materials from the beds or banks of Coos Bay or filling that body of water.

In determining whether to issue the Port's requested fill/removal permit, DSL was required to consider certain

---

[2] The Oregon Legislative Assembly amended ORS chapter 196 in 2011 and 2015. However, because DSL received the completed application on December 10, 2010, before the effective dates of the 2011 and 2015 amendments, those amendments did not apply to DSL's determination of whether to issue the permit. *See* ORS 196.825(10) (2009) ("In determining whether to issue a permit, the director [of DSL] may consider only standards and criteria in effect on the date the director receives the completed application."); *see also* ORS 196.825(11) (2016) (same). Thus, except as otherwise noted, all citations to the pertinent statutes are to the 2009 versions, which were in effect on December 10, 2010.

[3] All references in this opinion to OAR 141-085-0510 through 141-085-0785 are to those versions that became effective March 1, 2009, and were in effect when DSL received petitioners' completed application. *See* OAR 141-085-0565(2) ("[DSL] may consider only standards and criteria in effect on the date [DSL] receives the complete application or renewal request.").

criteria pursuant to ORS 196.825. That statute provided, in part:

"(1)   The Director of the Department of State Lands shall issue a permit * * * if the director determines that *the project* described in the application:

"(a)   Is consistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.600 to 196.905; and

"(b)   Would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation.

"(2)   In determining whether to issue a permit, the director shall consider all of the following:

"(a)   The public need for the proposed fill or removal and the social, economic or other public benefits likely to result from the proposed fill or removal. * * *

"(b)   The economic cost to the public if the proposed fill or removal is not accomplished.

"(c)   The availability of alternatives to the project for which the fill or removal is proposed.

"(d)   The availability of alternative sites for the proposed fill or removal.

"(e)   Whether the proposed fill or removal conforms to sound policies of conservation and would not interfere with public health and safety.

"(f)   Whether the proposed fill or removal is in conformance with existing public uses of the waters and with uses designated for adjacent land in an acknowledged comprehensive plan and land use regulations.

"(g)   Whether the proposed fill or removal is compatible with the acknowledged comprehensive plan and land use regulations for the area where the proposed fill or removal is to take place or can be conditioned on a future local approval to meet this criterion.

"(h)   Whether the proposed fill or removal is for streambank protection.

"(i)   Whether the applicant has provided all practicable mitigation to reduce the adverse effects of the proposed fill or removal in the manner set forth in ORS 196.800. * * *"

(Emphasis added.) The word "project" is not defined in ORS chapter 196.

Pursuant to its general rulemaking authority,[4] DSL promulgated rules that established regulatory standards for its review of permit applications. *See* OAR 141-085-0500 to 141-085-0785. DSL's rules largely echo the statutory criteria announced in ORS 196.825. OAR 141-085-0565(3), (4).

## II.   FACTS

Our summary of the pertinent facts reflects the facts as described in the final order.[5] In 2007, the Port began seeking DSL's authorization to conduct removal and fill activities associated with constructing a marine terminal in Coos Bay. The Port's purpose is to develop "a multi-berth,

---

[4] ORS 196.692 states:

"(1) The Department of State Lands shall adopt rules to carry out the provisions of ORS 196.668 to 196.692, 196.800, 196.810, 196.818, 196.825, 196.830, 196.850 to 196.860, 196.885, 196.905, 197.015, 197.279, 215.213, 215.283, 215.284, 215.418 and 227.350.

"(2) Rules adopted pursuant to subsection (1) of this section shall include rules governing the application for and issuance of permits to remove material from the beds or banks of any waters of this state or to fill any waters of this state including, but not limited to, clear and objective standards and criteria for determining whether to grant or deny a permit."

[5] As noted, the final order issued on the parties' cross-motions for summary determination. We review the parties' cross-motions for summary determination as we would cross-motions for summary judgment in the civil context. *Hamlin v. PERB*, 273 Or App 796, 798 n 2, 359 P3d 581 (2015); *see Bergeron v. Aero Sales, Inc.*, 205 Or App 257, 261, 134 P3d 964, *rev den*, 341 Or 548 (2006) ("On appeal from cross-motions for summary judgment, if error is assigned to the granting of one and the denial of the other, both rulings are reviewable.").

In keeping with that standard, an ALJ or other agency factfinder should not resolve disputes of fact on a motion for summary determination:

"As is the case on a motion for summary judgment under ORCP 47, the adjudicator is not permitted to make factual findings at that stage of the proceedings. Rather, the issues that an agency is empowered to resolve on summary determination are purely legal: (1) whether the evidence presented gives rise to a dispute of material fact and (2) whether the moving party 'is entitled to a favorable ruling as a matter of law.' OAR 137-003-0580(6)."

*Hamlin*, 273 Or App at 798 n 2.

In this case, the final order contains a section labeled "Findings of Fact." We cannot readily discern the extent to which that section, no matter how labeled, actually recites only undisputed facts and the extent to which it also reflects the resolution of some disputed facts. However, no party contends on judicial review that the director improperly engaged in factfinding in ruling on the cross-motions for summary determination, so we do not address that issue further.

multi-purpose shipping facility that will accommodate large vessels." The Port plans to dredge an access channel to connect a newly constructed slip to the bay. Although the project was initially configured to accommodate shipping of liquefied natural gas (LNG), DSL determined that the access channel and terminal will have independent utility, in that they will "be able to function regardless of the cargo that is shipped."

As part of the required permitting process and under consolidated permitting procedures, the Port used a single application—a Joint Permit Application Form—to apply for authorization from the U.S. Army Corps of Engineers (the Corps), under the Clean Water Act and the Rivers and Harbors Act, as well as a permit from DSL under Oregon's fill/removal law, to "dredge and maintain the access channel, connect the new slip to the access channel, and maintain the slip." The Port submitted its initial application in 2007, but DSL rejected the Port's materials as incomplete several times before accepting the Port's completed application in December 2010.[6]

In its final application, the Port proposed that the construction of the new slip and access channel be completed in two phases—the "freshwater" phase and the "saltwater" phase—to "minimize impacts on fisheries, reduce the total period of estuary turbidity, and to extend the time available for construction." The Port described the "basic concept" as being "to excavate the majority of the proposed slip area * * * and construct most of the in-water structures while maintaining a natural physical barrier between the slip and Coos Bay."

The freshwater phase will involve removing up to 4 million cubic yards of material inland from the shore of Coos Bay, in an upland area above the highest measured tide, to create a 45-foot deep terminal slip for the western

---

[6] At the request of DSL and the Corps, a biological evaluation and biological assessment were prepared to address the effects of "the proposed project on sensitive fish and invertebrate species and their habitats." In addition, DSL opened a public-comment period on the completed application and provided the substance of the resulting comments to the Port. DSL received the Port's responses to those comments and some supplemental information before the director issued her final order.

berth. The Port explained in its application that, during the first phase, "[t]he proposed slip would be excavated and dredged from existing upland. Most construction of the new slip and marine facilities would be conducted behind a berm that would isolate the construction area from the Coos Bay estuary." The Port described the "berm" as a "natural physical barrier between the slip and Coos Bay" and further explained that "Old Jordan Cove Road * * * runs along the Coos Bay shoreline and will be kept intact to form the crest of the berm during the entire freshwater phase." Thus, the freshwater phase will mostly take place on existing uplands behind a 40-foot wide berm that separates the terminal site from Coos Bay.

The saltwater phase of the project will include dredging in the bay to create the access channel and, eventually, removal of the berm "to connect the new slip with the access channel."[7] The Port explained in its final application that the "only construction activities planned within water after berm removal would be some minor dredging, installation of up to eight pilings * * * and completion of riprap and bulkhead wall in the area where the berm was removed." Altogether, the application requested authorization to remove 1.75 million cubic yards of material from the waters of the state.

The Port asserted in its application that the freshwater phase "will include only upland excavation and construction [of a berth] not subject to regulation under * * * [the] Oregon Removal-Fill Statute because the work will not be in a jurisdictional wetland, water of the United States, or water of the State of Oregon." However, the Port acknowledged that the saltwater phase, which will take place "in waters of the United States and waters of the State," is subject to the requirements of the fill/removal statute, ORS chapter 196.

In December 2011, DSL issued the original fill/removal permit to the Port, which DSL modified later that month to make a minor administrative change not pertinent

---

[7] In conjunction with the other issues raised in their second assignment of error, petitioners assert that the fill/removal permit does not cover removal of the berm. We address—and reject—that contention later in this opinion.

here. The permit authorizes the saltwater phase, including placing up to eight concrete pilings and removing 1.75 million cubic yards of material to construct an access channel to the marine terminal. Significantly, DSL agreed with the Port that, because the freshwater phase is located in an upland area "not currently part of Coos Bay," DSL does not have authority over the freshwater phase of the project.

Petitioners requested a contested case hearing on the permit, DSL referred that request to the Office of Administrative Hearings, and an administrative law judge (ALJ) was assigned to conduct the hearing. Petitioners asserted that the permit was flawed for several reasons, including that DSL had not considered the "future uses of" the terminal, "including coal export and liquefied natural gas and their effects on the relevant statutory criteria." Petitioners tied that argument to ORS 196.825, contending that DSL's duty to consider the effects of the "project" included an obligation to consider the effects of the proposed terminal's *operation*, which DSL had not done. Further, petitioners challenged DSL's determination that the freshwater phase of construction was not within DSL's "jurisdiction as a 'water of the state.'"

Before the hearing, the parties filed cross-motions for summary determination as to all the issues raised by petitioners. The ALJ ruled on the cross-motions, granting respondents' motions and denying petitioners' motion. The ALJ agreed with the Port that DSL was not required to consider the effects of operating the terminal. The ALJ also concluded that DSL's determination "that the dredging conducted behind the berm was not within [DSL's] jurisdiction was lawful." Because no issues remained, the ALJ issued a proposed order affirming DSL's approval of the permit. Petitioners and the Port filed exceptions, and the director issued an amended proposed order in early 2013. Petitioners filed additional exceptions to that amended proposed order, reiterating arguments they had made earlier.

The director issued her final order in 2013, adopting the ALJ's findings and conclusions. The director explained that, because the upland area is located above the highest measured tide of Coos Bay and "tidal bays are jurisdictional

to the elevation of the highest measured tide," the upland area is not a water of the state. Accordingly, she concluded, DSL will not have authority over the upland area until after the berm is breached and the newly dug slip fills with water from the bay. The director also rejected petitioners' contention that DSL erred by not considering the effects associated with operating the proposed terminal. Accordingly, the director "concur[red] with [the ALJ's] grants of summary determination" and affirmed the permit issued to the Port. It is the director's final order that petitioners challenge in this proceeding.

## III. STANDARD OF REVIEW

Petitioners' challenges to the final order raise only legal issues; petitioners do not contest any of the statements of fact on which the order is based. Accordingly, we review for legal error. *Smith v. PERB*, 235 Or App 159, 161, 230 P3d 88 (2010) (reviewing PERB order for legal error when order resulted from grant of summary determination); ORS 183.482(8)(a) (authorizing us to review an order in a contested case to determine if "the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action").[8]

## IV. ANALYSIS

On review, petitioners raise two assignments of error, both challenging the director's grant of summary determination to respondents and her concomitant denial of summary determination to petitioners. First, petitioners argue that the director erred when she concluded that DSL was not required to consider the effects of the proposed terminal's operation when determining whether to grant the Port's application for the fill/removal permit. Second, petitioners argue that the director erred when she concluded that the proposed freshwater phase activities did not fall within DSL's jurisdiction because the activities would not involve removing material from, or filling, "waters of the state." We address those arguments in turn.

---

[8] As explained earlier, petitioners have not challenged any factfinding that the ALJ or the director may have conducted in ruling on the parties' cross-motions for summary determination. *See* 284 Or App at 625 n 5.

## A. *The Effects of Operating the Marine Terminal*

Petitioners' first argument is based on ORS 196.825(1), which states that the director shall grant a fill/removal permit if she determines that "the project described in the application" would be "consistent with the protection, conservation and best use of the water resources of this state" and "not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation." Petitioners contend that the use of the word "project" in that provision means that DSL was required to consider not only the effects of the fill and removal activities associated with constructing the proposed marine terminal but also the effects of operating that terminal once it is completed.[9] Put succinctly, petitioners assert that "project" encompasses "operation." The director rejected that argument in the final order. Because DSL acknowledges that it did not consider the effects of the proposed terminal's operation when it issued the fill/removal permit, petitioners conclude that the director erred by approving that permit. Respondents take a different view of ORS 196.825, contending that the term "project," as used in that statute, does not include ongoing operations.

Thus, the meaning of the word "project," as used in ORS 196.825(1), is central to this dispute. In considering the meaning of that term, our goal is to discern the legislature's intentions. To do so, we examine the text of the statutes in context, along with relevant legislative history. *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009). For the following reasons, we conclude that the term "project," as used in ORS 196.825(1), relates to the construction of a proposed development and does not include the effects of operating that development after it is completed.

Our inquiry begins with an examination of the statutory text. As noted, under ORS 196.825(1), issuance of

---

[9] Although petitioners originally also asserted that DSL erred by not considering the effects of constructing the terminal, they acknowledged at oral argument that they are not reiterating that contention on judicial review, except to the extent that that argument is implicated by their second assignment of error, in which they challenge DSL's determination that it lacks authority over the freshwater phase of the project.

a fill/removal permit is conditioned upon a finding that the "project" meets the statutory goals of protecting, conserving, and making the "best use" of the state's waters, and that it would not unreasonably interfere with the state's "paramount" interest in navigation, fishing, and public recreation. In determining whether to issue a permit under that statute, the director is required to consider nine criteria that are listed in ORS 196.825(2). Only one of those listed criteria is phrased in terms of the "project." *See* ORS 196.825(2)(c) (the director should consider "[t]he availability of alternatives to the project for which the fill or removal is proposed"). The remaining criteria are phrased in terms of the characteristics or effect of the "proposed fill or removal." ORS 196.825(2) (a), (b), (d) - (i).

Because "project" is not defined in ORS chapter 196, we first look to its common usage. *Webster's* defines "project" both broadly and narrowly as "a specific plan or design," "a devised or proposed plan," and "an undertaking devised to effect the reclamation or improvement of a particular area of land." *Webster's Third New Int'l Dictionary* 1813 (unabridged ed 2002). Those definitions do not, themselves, strongly suggest either that "project" encompasses a development's future operation or that it does not extend so far.

Greater insight into the legislature's intention can be found by considering the context in which the term "project" is used in ORS chapter 196. We explored that context to some extent in *Examilotis v. Dept. of State Lands*, 239 Or App 522, 535, 244 P3d 880 (2010). In that case, we evaluated the relationship between ORS 196.825 (2005) and the pertinent version of DSL's rules, adopted in 2006. *Examilotis*, 239 Or App at 528. The 2005 version of ORS 196.825 required the director to issue a fill/removal permit if she determined that "the removal" (rather than "the project") would be consistent with the broad statutory goals.[10] ORS 196.825(1), (2) (2005).

---

[10] ORS 196.825(1) (2005) provided:

"The Director of the Department of State Lands shall issue a permit to remove material from the beds or banks of any waters of this state applied for under ORS 196.815 if the director determines that *the removal* described in the application will not be inconsistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.805."

(Emphasis added.)

The statute also listed several criteria that, similar to the criteria listed in ORS 196.825(2) (2009), mostly required DSL to analyze effects of the "fill" with a single exception—one criterion required consideration of the "availability of alternatives to *the project* for which the fill is proposed."[11] ORS 196.825(3) (2005) (emphasis added). One of DSL's rules set out standards for permit review that "were substantially similar—but not identical—to" those statutory criteria. *Examilotis*, 239 Or App at 528. Significantly, the rule used the term "the project" where the analogous statutory criteria referred to "the proposed fill." *See id.* at 528-29 (comparing statute to rule).

On judicial review, the *Examilotis* petitioners challenged a DSL decision affirming issuance of a fill/removal permit, asserting that DSL had failed to consider "project"-wide effects, as the agency's rule then mandated. *Id.* at 536. DSL argued, first, that the word "project" in its rule meant nothing more than "fill and removal activities." *Id.* at 532. Alternatively, DSL contended that it simply had not applied any requirements of its rule "that exceeded the permit criteria set out in ORS 196.825." *Id.*

We affirmed, concluding that, to the extent that DSL's rule required it to analyze multiple aspects of the "project," the agency would exceed its statutory authority if it applied that rule. *Id.* at 537-38. We reached that conclusion after construing the word "project" as used in ORS 196.825 (2005), holding that it must mean something more than the proposed fill:

> "Given the separate requirements to consider alternatives to both 'the project for which the fill is proposed' and alternative sites 'for the proposed fill,' it is plain that 'project' means something different from 'the proposed fill.'"

*Id.* at 534. After considering dictionary definitions and other provisions of ORS 196.825 (2005)—particularly those referencing "the project site" and a "project plan"—we concluded

---

[11] The criteria in the 2009 statute, pertinent to this case, are phrased in terms of the "proposed fill or removal." ORS 196.825(2). Before the 2007 amendments, the criteria referenced only the "proposed fill." Or Laws 2007, ch 849, § 4. That change to the statutory wording has no bearing on our analysis here.

that the statutory term "project" meant "the development facilitated by the proposed fill." *Id.* at 535. Accordingly, we held that the rule "exceeded the agency's authority because it required DSL to review an application more broadly than would otherwise be required by statute." *Id.* at 537. We rejected the challenge to the fill/removal permit, which was premised on an argument that DSL should have—but had not—applied that aspect of the rule in considering the permit application. *Id.* at 538.

*Examilotis* is helpful to our resolution of this case in two respects. First, it points to other provisions of ORS chapter 196 as providing context for discerning the meaning of the statutory term "project." We undertake a similar analysis below. Second, nothing in the opinion can be read to suggest that "project" goes beyond project development to ongoing operations.

Following the lead of *Examilotis*, we next consider statutory context, including the various subsections of ORS 196.825 as well as other provisions of chapter 196, to determine whether they support, or undermine, petitioners' contention that "project" includes ongoing operations of a proposed development. The structure of ORS 196.825 indicates that subsections (1) and (2) are part of the same inquiry. Subsection (1) provides that the director must issue a permit if she "determines" that the "project" is consistent with certain overarching policies, and subsection (2) identifies specific criteria that the director must consider in *"determining* whether to issue that permit." (Emphasis added.) Because the criteria set forth in subsection (2) require DSL to evaluate both the "proposed fill and removal" and "the project" (the latter only in the context of considering alternative sites), the general determination clause in ORS 196.825(1) must include the broader of the two terms—"project"—for consistency.

Thus, we conclude that "project," as used in ORS 196.825(1), is meant to encompass the same meaning it has as used in ORS 196.825(2)(c). No reference to ongoing operations is found either in the single criterion listed in ORS 196.825(2) that refers to the "project" or in any of the other criteria, which refer to "proposed fill and removal."

More broadly, none of the other provisions in ORS chapter 196 that use the term "project" suggest that the legislature intended that term to include ongoing operations of a development. For example, ORS 196.825(11)(b) states that a completed permit application must contain "all necessary information for the director to determine whether to issue a permit." The provision goes on to list what that "necessary information" must include:

"(A)  A map showing the project site with sufficient accuracy to easily locate the removal or fill site;

"(B)  A project plan showing the project site and proposed alterations;

"(C)  The fee required under ORS 196.815;

"(D)  Any changes that may be made to the hydraulic characteristics of waters of this state and a plan to minimize or avoid any adverse effects of those changes;

"(E)  If the project may cause substantial adverse effects on aquatic life or aquatic habitat within this state, documentation of existing conditions and resources and identification of the potential impact if the project is completed;

"(F)  An analysis of alternatives that evaluates practicable methods to minimize and avoid impacts to waters of this state;

"(G)  If the project is to fill or remove material from wetlands, a wetlands mitigation plan; and

"(H)  Any other information that the director deems pertinent and necessary to make an informed decision on whether the application complies with the policy and standards set forth in this section."

ORS 196.825(11)(b). If the legislature had intended "project" to encompass ongoing operations of a planned development, rather than just construction of the development itself, one would expect that the list of information required in a permit application would include at least some mention of operational activities. It does not. To the contrary, subparagraph (E) contemplates that "the project" will at some point be "completed," again indicating that "the project" refers to the development itself, not to its ongoing operations.

Subparagraph (G) also supports an interpretation of "project" that does not include ongoing operations, as it contemplates that a project may involve nothing more than "to fill or remove material[s]."

Similarly, ORS 196.682(1), which specifies conditions that DSL may put on a permit, requires DSL "to ensure that the project" meets certain design criteria, including being the minimum size necessary and being designed to minimize the need to alter waters of the state. Only one subsection of that statute can reasonably be understood to refer to ongoing operations; it requires DSL to ensure that "the project" is "designed to minimize impacts from implementing the project." ORS 196.682(1)(d). That provision, too, differentiates between "the project" itself and the effects of its "implementation," perhaps including operations. Finally, ORS 196.805, which sets out the general policy underlying DSL's authority to issue fill/removal permits, reflects a focus on development that necessitates fill and removal activity.[12] It does not reference the effects of operating the development after construction is complete.

The legislative history of ORS 196.825 provides further support for an interpretation of "project" that does not encompass the ongoing operations of a proposed development. Before 2007, ORS 196.825(1) required the director to issue a permit if she determined "that the *removal* described in the application" would "not be inconsistent with the protection, conservation and best use of the water resources of this

---

[12] ORS 196.805(1) provides:

"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Department of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state."

state" and that "the proposed *fill*" would not unreasonably interfere with preserving the use of state waters for navigation, fishing, and public recreation. ORS 196.825(1), (2) (2005) (emphases added). As discussed above in conjunction with our review of *Examilotis*, the criteria then listed for the director's consideration—with a single exception— referred exclusively to "the proposed fill," explaining, for example, that the director should consider "the economic cost to the public if the proposed fill is not accomplished." ORS 196.825(3)(b) (2005).

The 2007 legislature consolidated what had been subsections (1) and (2) of ORS 196.825 into subsection (1). In conjunction with that change, the legislature changed the references to "removal" (in the previous version of subsection (1)) and "fill" (in the old subsection (2)) to "project." Or Laws 2007, ch 849, § 4. The result is that, as petitioners emphasize, ORS 196.825(1) calls for the director to issue a fill/removal permit if she determines that "the project" meets the overarching goals set out in subsection (1).

The legislative history of that amendment strongly suggests that the legislature did not mean the change from "removal" and "fill" to "project," in ORS 196.825(1), to have any substantive significance. To the contrary, the director testified to the legislature that the amendment was intended to improve readability and consistency, not to substantively alter the statute. Hearing on HB 2105 Before the House Comm on Energy and Env't, 74th Legis Ass'y (Feb 5, 2007) (Statement of DSL Director Louise Solliday). When asked about the change from "removal" to "project," she responded that it was "purely" a form-and-style change that was recommended by legislative counsel and that the amended wording reflected the agency's existing practice. *Id.*

In sum, the text, context, and legislative history of ORS 196.825 reveal that the legislature intended the word "project," as used in subsection (1) of the statute, to refer to the development that involves removal or fill activity. It does not, as petitioners argue, encompass the effects of post-construction operation of the development. Accordingly, use of the word "project" in ORS 196.825(1) does not require DSL to consider post-construction operational effects of a

proposed development when determining whether to issue a fill/removal permit in conjunction with that development. The director did not err when she concluded that DSL was not required to consider ongoing operations of the proposed marine terminal when evaluating the Port's application for a permit under ORS 196.825. Petitioners' argument to the contrary presents no basis for reversal of the director's final order.

B. *The Freshwater Phase of the Project and Removal of the Berm*

Petitioners also challenge DSL's determination that it lacked authority to regulate the freshwater phase of the project, which centered around construction of the new slip and associated facilities. Again, as the permit explained, that slip will "be excavated and dredged from existing upland" and most of the construction will "be conducted behind a berm that would isolate the construction area from the Coos Bay estuary." Although excavation of the slip will begin on dry land, as digging continues below the water table, the Port ultimately will perform "wet excavation." Finally, after construction of the slip and marine facilities, the berm— some of which consists of material at or below the highest measured tide of Coos Bay—will be removed to connect the new slip with the access channel constructed as part of the saltwater phase.

DSL stated in the permit that, because the freshwater phase involves excavation upland, above the high-tide measurement, it does not require DSL's authorization. In her final order, the director agreed, concluding that DSL's "determination that the dredging conducted behind the berm was not within its jurisdiction was lawful and supported by substantial evidence." The director explained, "The upland area where the proposed slip is to be constructed is not currently part of Coos Bay. It is above the highest measured tide."

Petitioners do not dispute that the slip will be excavated behind the berm, in an upland area that is above the highest measured tide of Coos Bay. Nonetheless, they mount several challenges to the director's conclusion that DSL lacks authority to regulate the freshwater phase of the project. We

begin with petitioners' assertion that the freshwater activities constituted "channel relocation" involving the taking of more than 50 cubic yards of material from a water of the state and, therefore, would qualify as "'removal'" activity requiring a permit. *See* ORS 196.800(12)(b) (defining "'[r]emoval'" to include "movement by artificial means" of more than 50 cubic yards "of material on or within the bed of such waters [of the state], including channel relocation"). Petitioners assert that, "because it effectively reshapes Coos Bay by adding 75 acres of new area, [the upland activity] * * * falls within the definition of channel relocation."

Petitioners' argument does not take into account the statutory definition of "'[c]hannel relocation'" as "a change in location of a channel in which a new channel is dug and the flow is diverted from the old channel into a new channel." ORS 196.800(1), (12)(b). In accordance with the statutory definition's focus on "flow," DSL has further defined "'[c]hannel'" as "a natural (perennial or intermittent stream) or human made (*e.g.*, drainage ditch) waterway that periodically or continuously contains moving water and has a defined bed and bank that serve to confine the water." OAR 141-085-0510(11). Coos Bay does not, itself, fit that definition of "channel," and petitioners have not identified any flowing waterway that will be diverted by the freshwaterphase activities. Their "channel relocation" argument presents no basis for reversing the final order.

Petitioners next focus on the "wet excavation" that eventually will occur in the upland area, before the berm is removed. Petitioners point out that, in dredging dirt to create the slip, workers will, at some point, hit the water table and a pool of water will form. Petitioners argue that DSL's authority therefore extends to the upland site because the wet excavation will result in the type of "[a]rtificially [c]reated * * * [p]ond" over which DSL asserts jurisdiction under OAR 141-085-0515(6)(a). However, that rule provides that artificially created ponds "*are* jurisdictional when they *are* * * * [e]qual to or greater than one acre in size[.]" (Emphasis added.) Thus, for DSL to have jurisdiction, an artificial pond must already exist at the time of permit authorization; that is, the rule does not give DSL authority over

a pond that has yet to be created. As the director explained in the final order, "the upland area is not an artificial * * * pond" and, for that reason, "is not subject to [DSL's] jurisdiction under" OAR 141-085-0515(6). Nor does that rule give the agency authority over ponds *as* they are being created. As respondents note, "[i]f Petitioners' proposal were the law, the boundaries of the State's jurisdiction would shift with every scoop of an excavator if the excavation hit groundwater." Petitioner's "artificial pond" argument lacks merit.

Finally, petitioners assert that DSL's fill/removal permit does not include authorization for the Port to remove the berm to connect the bay with the newly constructed upland slip.[13] Therefore, because "the berm will be removed from the bay side, which is inarguably a water of the state," petitioners contend that DSL erred when it failed to exercise authority over the berm removal. The Port asserts that berm removal is covered by the permit, arguing that "the removal of the portion of the berm subject to the DSL's jurisdiction that will remain standing after the upland excavation is a permitted activity." We agree with the Port that the fill/removal permit authorizes that portion of the berm removal.

The Port's permit application itself clearly requested authorization to remove the berm as part of the overall project. The application states that the Port sought a fill/removal permit to "dredge and maintain the access channel, *connect the new slip to the access channel*, and maintain the slip." (Emphasis added.) Further, the application explained that, "[a]fter construction of the slip and marine facilities, the berm would be removed to connect the new slip with the access channel." Moreover, the application stated, the "berm would be removed during the approved in-water work period"—that is, as part of the saltwater phase of the project.

---

[13] Petitioners' argument on review is narrow. They did not argue to the ALJ or DSL—and do not argue to us on judicial review—that, even if the permit does cover berm removal, DSL did not adequately consider the effects of that action. Accordingly, our review is limited to whether the permit's authorization to remove 1.75 million cubic yards of material included the portion of the berm removal within DSL's authority to regulate (that portion below the highest measured tide).

Consistent with that application, the approved fill/removal permit described the activity it authorized as follows:

"The removal-fill activity authorized in this permit is excavating the access channel, placing dredge spoil in a small non-tidal wetland and constructing compensatory non-tidal wetland, mudflat and eelgrass mitigation. * * * The Port will dredge and maintain the access channel, *connect the new slip to the access channel,* and maintain the slip."

(Emphasis added.) The action that connects the slip to the access channel is removal of the berm.

The director's final order confirms that the permit authorizes berm removal. In that order, the director described one of the questions posed by petitioners' challenge to the permit as "whether removal of the berm after excavation and construction is complete will permanently alter the shoreline of Coos Bay in ways that significantly impact the state's water resources." The director explained that "[r]emoving the berm is part of dredging the access channel," indicating (as did the application) that berm removal is part of the saltwater phase of the project that the permit authorizes.

In sum, the permit application, the permit itself, and the final order all establish that the fill/removal activity authorized by the permit includes removal of the berm. Petitioners' contrary contention lacks merit.

## V. CONCLUSION

None of petitioners' challenges to the final order establishes that the director erred in granting summary determination to respondents, in denying petitioners' motion for summary determination, or in issuing the final order. The director correctly concluded that DSL was not required, under ORS 196.825, to consider the effects of operating the terminal when it evaluated the Port's application for a fill/removal permit and issued the requested permit. Nor did the director err in concluding that DSL lacked authority to regulate the freshwater phase of the project. Finally, the final order correctly reflects that the permit authorizes removal of the berm.

Affirmed.